Filed 1/4/22  V.R. v. Superior Court CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| V.R.,<br><br>    Petitioner,<br><br> v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>    Respondent;<br>_____<br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al.,<br><br>  Real Parties in Interest. | B311660<br><br>(Los Angeles County<br>Super. Ct. No. 18CCJP03467A) |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.452.)  Daniel Zeke Zeidler, Judge.  Petition denied.

Los Angeles Dependency Lawyers, Inc., Law Office of Martin Lee, Bernadette Reyes and David Paul for Petitioner.

No appearance for Respondent.

No appearance for Real Party in Interest Los Angeles County Department of Children and Family Services.

Children's Law Center and Stanley Wu for Real Party in Interest N.R.

\* \* \* \* \* \* \* \* \* \* \*

Petitioner V.R. is the mother of now 10-year-old N.R. and four-year-old R.L., both dependents of the juvenile court. R.L. is not at issue in this proceeding, and has been returned to mother's care. On March 26, 2021, the juvenile court terminated reunification services and set a selection and implementation hearing under Welfare and Institutions Code section 366.26 for N.R.[1] Mother filed a petition for extraordinary writ pursuant to rule 8.452 of the California Rules of Court challenging the order, arguing there was no substantial evidence it would be detrimental to return N.R. to her care. We deny the petition, finding substantial evidence supports the juvenile court's order. The September 15, 2021 order staying the section 366.26 hearing is hereby lifted.

## FACTUAL AND PROCEDURAL BACKGROUND

This family came to the attention of the Los Angeles County Department of Children and Family Services (Department) over a period of several months beginning in February 2018, following a series of referrals that mother was physically and emotionally abusing N.R., abusing drugs, prostituting herself, and exposing her children to dangerous

---

[1]     All further statutory references are to the Welfare and Institutions Code.

adults. When the Department investigated the initial February referral, N.R. had a black eye and small blood clots on her temple and cheek.

Mother is a Regional Center client, and was diagnosed with mild to moderate intellectual disability. She has a parent life coach through the Regional Center, who has worked with mother for many years and visits her home every other day to help with daily tasks and errands.

Mother denied the allegations and reported that N.R. was bullied by neighborhood children. N.R. also denied any abuse and said her injuries were caused by other children.

When the social worker first visited the family home in February 2018, there were six or seven unrelated adults inside, and 10 people outside of the home, who were mother's friends and friends of a neighbor with whom mother was arguing.

When the Department visited the family home in May 2018, a man was passed out in mother's doorway. Mother told the Department she had some friends over for the weekend, and when she asked them to leave, they became upset, vandalized her home, and beat her up. N.R. admitted she saw mother get "beat up." Mother and the children went to a neighbor's house and called police.

N.R.'s school called the Department later that month to report that N.R. had a black eye, and N.R. told a school staff member that mother punched her three times with a closed fist. N.R. told the Department that mother slapped her because she did not want to go to school. N.R. denied that mother had ever hit her before. Mother denied hitting N.R. but admitted that N.R. had thrown a severe tantrum that morning because she did not want to go to school.

Mother's Regional Center coach did not suspect any abuse or neglect, and reported that N.R. often acts out and sometimes says things that are not true.

The family has an extensive history of referrals to the Department, with 16 referrals between 2012 and 2018 for physical abuse and neglect, including that mother abused drugs, would leave N.R. with "random" people, including a registered sex offender (R.L.'s father), and that N.R. reported mother was hitting her. Mother received voluntary family maintenance services from August 2015 until March 2016.

R.L.'s father has an extensive criminal history, including a 2005 conviction for four counts of committing lewd and lascivious acts with a child under the age of 14 against two victims, for which he was sentenced to 12 years in prison. He was then on parole, and he and mother were no longer in a relationship.

A nondetained petition was filed with allegations under section 300, subdivisions (a), (b), (d), and (j) that mother physically abused N.R. by giving her a black eye, and that R.L.'s father is a convicted sex offender which places R.L. at risk. At the June 1, 2018 detention hearing, the court allowed the children to remain with mother under the supervision of the Department, and ordered mother to participate in a mental health evaluation, cooperate with all Regional Center services, and submit to on-demand drug testing.

According to the July 2018 jurisdiction/disposition report, mother has a history of acting out aggressively toward others in front of the children. N.R. had started to have severe tantrums and was acting out aggressively as well.

N.R. denied that R.L.'s father ever touched her inappropriately. She could not recall if she had ever been alone

with him. Mother denied leaving the children alone with R.L.'s father; paternal relatives supervised his visits with R.L.

At the July 26, 2018 adjudication and disposition hearing, the juvenile court sustained "inappropriate discipline" allegations under section 300, subdivision (b) pursuant to mother's no contest plea. The children were permitted to remain in mother's care. Mother was ordered to participate in parenting classes, family preservation services, and counseling, and she was to continue to receive services through the Regional Center.

On October 12, 2018, subsequent and supplemental petitions under sections 342 and 387 were filed, alleging that mother suffered from emotional problems that placed her children at risk of harm. Mother had made threats to her Regional Center case worker, and she allowed maternal uncle, who had molested maternal aunt as a child, to have unlimited access to the children. Mother was not complying with court orders, as she allowed R.L.'s father to have access to the children. The children were detained from mother and placed in foster care.

According to the October 2018 detention report, the Department received new referrals after an incident where maternal uncle was stabbed at mother's home, in front of the children. N.R. was hurt when she tried to intervene, and mother was also beaten up. Mother did not call law enforcement or seek medical treatment for N.R. or maternal uncle.

According to the Regional Center director, mother is gang-affiliated, and the attack was in retaliation for mother stealing drugs from gang members. Mother threatened to "shoot" a Regional Center worker, and made multiple threats while the

children were present. Also, years earlier, a Regional Center worker was shot by gang members allegedly sent by mother.

N.R. refused to speak with the social worker about the incident, as mother had told her she would be "taken away" if she spoke with the Department. N.R. eventually confirmed she was present during the referral incident, and had spent time alone with maternal uncle. The social worker could see a scratch on N.R.'s arm, which N.R. attributed to the incident. N.R. reported that she was injured while "socking" people to protect maternal uncle.

According to the November 2018 jurisdiction/disposition report, the children had adjusted well in foster care. N.R. had some behavioral issues, but her episodes were sporadic, and she generally followed directions well.

According to the Regional Center, workers assisting mother often requested reassignment due to mother's aggression, mood swings, and threats, including death threats. Her new service provider, Sylvia Schneider, reported that mother was participating in anger management and parenting classes, and Ms. Schneider supervised mother's visits with the children. She reported that the visits went well and that mother was affectionate and attentive to her children.

On November 26, 2018, the juvenile court sustained the allegations in the subsequent and supplemental petitions. Mother was ordered to receive monitored visitation, and to participate in services.

According to the Department's July 25, 2019 status review report, N.R. was hospitalized for suicidal ideation in May 2019. She and her sister were placed with maternal great-aunt following N.R.'s release from the hospital. It was N.R.'s fourth

placement since she was detained from mother. She was hospitalized again later that month and again in June 2019, after she complained of auditory hallucinations that were telling her to kill her younger sister. Maternal great-aunt was struggling to care for N.R. and sometimes required police intervention to deal with her behaviors. N.R. had been diagnosed with depression, aggression, and suicidal thoughts. In July 2019, maternal great-aunt asked for the children to be removed from her home.

Mother had moved into temporary housing provided by the Regional Center, and she was working at a toy factory. Mother had completed her parenting, counseling, and anger management programs but chose to continue participating in the programs. She was actively participating in her services and receiving substantial support from the Regional Center to help with her parenting skills, chores, hygiene, and money management.

Mother consistently visited the children. The visits generally went well, except that mother had a difficult time managing N.R.'s behaviors. The social worker noted that mother "is a trigger" for N.R. During N.R.'s psychiatric hospitalizations, mother frequently made her upset. Mother also allowed N.R. to have a video call with R.L.'s father, even though he was not supposed to have any contact with her.

N.R.'s behaviors continued to be problematic, and she had to be re-placed multiple times over a period of several months. In September 2019, N.R. was placed with a highly trained caregiver though the Intensive Services Foster Care program. This was her 11th placement. Because of the high level of care required for N.R., she and her sister could not be placed together. N.R.'s behaviors continued to be a problem, and she had to be

transitioned to another Intensive Services Foster Care placement within the month.

The Department's November 2019 status review report noted that N.R. had not expressed any suicidal ideation, but did express "homicidal ideation when she is upset." N.R.'s therapist was working to help N.R. decrease her tantrums and her head banging. N.R.'s tantrums made it difficult to take her out in the community and created safety risks for N.R. and others.

Mother had fully complied with most aspects of her case plan. However, the Department did not recommend that the children be returned to mother, as mother "triggered" N.R., and did not seem to understand the extent of her significant needs.

N.R. had another psychiatric hospitalization in November 2019, after she was suspended from school for taunting and screaming at other children, and she had a severe tantrum and could not be calmed. She was diagnosed with bipolar affective disorder.

N.R. was hospitalized again in late November 2019, after assaulting her foster sibling, punching holes in the wall of her foster home, and assaulting her in-home counselor. She was hospitalized again in late December 2019.

According to N.R.'s therapist, N.R. has daily verbal outbursts, physical aggression, and makes threats to others. She was not responding well to therapy, or using the skills she learned there. N.R. was triggered by visits with mother. N.R.'s therapist did not believe that beginning conjoint therapy with mother would benefit N.R. until she was more stable.

As of January 2020, mother was still living in the Regional Center facility, which did not allow overnight visitation with the

children or for the children to reside with her.  She was still looking for appropriate housing.

N.R.'s foster mother reported that N.R.'s behaviors escalated after visits with mother.  Mother did not appear to understand the severity of N.R.'s issues.  She was often unable to manage N.R.'s behaviors during visits.  According to N.R.'s foster mother, N.R. continued to have daily tantrums that posed a safety risk to herself and others.  The foster mother frequently had to contact the Intensive Services Foster Care team for assistance with N.R.'s severe tantrums.  The team was providing substantial services to N.R., including five meetings per week with her in-home counselors, two therapy sessions per week, and twice monthly visits with her psychiatrist.  N.R. was failing all of her classes at school.

N.R. was hospitalized again in early January 2020.  Her caregiver was reluctant to take N.R. back into her home following the January hospitalization due to N.R.'s instability and aggression.  Later that month, the caregiver gave a 14-day notice to have N.R. removed from her home.  N.R. was initially placed in shelter care, because the Department could not find an available placement.  She was placed with a new caregiver at the end of January.  N.R. continued to have aggressive tantrums and physical confrontations with her caregiver and other children.

As of the Department's April 2020 report, mother had still not secured housing where the children could be placed with her.  Mother continued to participate in programs and was still employed.  Mother had fully complied with her case plan and was making "some progress" with achieving treatment goals in individual therapy.  However, mother still struggled to control N.R.'s aggressive behaviors during visits, and mother "continues

to need assistance . . . managing the children and ensuring their safety."

The Department remained concerned about mother's ability to safely parent her children. Mother believed that N.R. would not exhibit the same behaviors at home with her. The Department had recently learned that mother continued to be in contact with R.L.'s father, despite his status as a registered sex offender and his failure to engage in any services over the course of the dependency case. The Department recommended that reunification services be terminated.

The review hearing was continued due to the COVID-19 emergency.

According to the Department's August 2020 supplemental report, N.R. was struggling with virtual learning. N.R. had broken the caregiver's glass coffee table and washing machine, and she made a hole in the wall. N.R.'s therapist reported that N.R. had great difficulty coping with her negative emotions, and the therapist was worried N.R. would regress significantly if reunified with mother. Mother was still looking for housing. Her virtual visits were not going well; mother often called at random times instead of the scheduled time.

A court-appointed special advocate (CASA) was appointed for N.R. in July 2020. The CASA's August 2020 report noted that N.R. was happy in her current placement. N.R.'s principal at her new school reported that N.R. is a "good girl with good potential." He believed her disruptive behavior was attention seeking, but acknowledged that she needed day-to-day support. N.R.'s therapist reported that N.R. was dealing with a lot of trauma. The therapist was concerned that N.R.'s tantrums would

continue because N.R. was unable to process the negative emotions that caused the tantrums.

At the August 24, 2020 review hearing, the court continued mother's reunification services and set the matter for a section 366.25 subsequent review hearing on February 23, 2021.

According to the Department's November 2020 report, N.R.'s caregiver asked that she be removed from her home in October 2020, after N.R. was kicked out of her daycare program due to her daily disruptive behavior. N.R. was transitioned back to her maternal great-aunt's home, where her little sister was also placed. This was N.R.'s 13th placement. Maternal great-aunt reported that N.R. was doing well in her home.

Mother had moved into her own apartment in late October 2020. Mother was receiving parenting instruction, and the Regional Center parenting coordinator gave mother assistance with parenting 24 hours a day. The Department recommended that the children remain with maternal great-aunt, with the goal of gradually transitioning them back to mother's care.

According to N.R.'s CASA, maternal great-aunt reported that N.R. was generally doing well in her care, but her behaviors regressed after visiting with mother. N.R. wanted to stay with maternal great-aunt. The CASA believed the current placement was appropriate for N.R.

According to the Regional Center, mother was living in an apartment, and continued to be employed, although she was not currently working because of the COVID-19 emergency. Mother was receiving 75 hours per month of parenting services through Lead the Way, LLC. If overnight visits were approved, the Regional Center would provide funding for mother to receive "24 hour service 7 days a week."

In November 2020, mother started to have overnight weekend visits with the children. Regional Center staff were present to assist mother for the duration of the visits. Mother's parenting partner reported that the visits generally went well. However, on several occasions, N.R. refused to visit or did not want to stay overnight. Also, according to N.R., mother tried to force N.R. to speak with R.L.'s father on the phone, even though N.R. did not want to.

N.R. told the social worker she did not want to live with mother. She wanted to be adopted by maternal great-aunt. She did not like it that mother tried to make her speak with R.L.'s father. According to N.R.'s therapist, N.R. experienced regressions in her behavior after visits with mother. N.R. became upset when anyone tried to discuss living with mother. N.R. also refused to participate in conjoint counseling with mother.

Mother still lacked insight about N.R.'s needs. She attributed N.R.'s behavioral problems to "guilt that [N.R.] feels for being the reason that the children were removed from [mother's] care." Nevertheless, the Department recommended that the children be returned to mother.

N.R.'s CASA reported that N.R. was doing very well in maternal great-aunt's care. Her tantrums had subsided, and her behavior was greatly improved. N.R. consistently told the CASA that she wanted to remain placed with maternal great-aunt and did not want to be returned to mother. N.R. did not feel "comfortable" with mother, and N.R. was worried that mother was not ready to care for her. N.R. reported that mother was speaking with R.L.'s father, and she was worried "her life will go back to 'the way it was' with her mother prior to her removal."

Maternal great-aunt also told the CASA that N.R. was resistant to contact with mother, and that she would have tantrums to avoid visitation. Recently, when mother and her parent partner came to maternal great-aunt's home to pick up N.R. for a visit, N.R. refused to go. Mother yelled at maternal great-aunt and used profane and threatening language, blaming her for N.R.'s refusal to see mother. Mother's parent partner had to intervene to prevent mother from attacking maternal great-aunt after the two exchanged heated words.

According to mother's Regional Center worker, when N.R. did spend the night with mother, there was very little interaction between mother and N.R., and N.R. spent most of the time in her room on her phone. Mother's parenting coordinator reported that visits between mother and N.R. were "difficult."

N.R. refused to speak about mother during her therapy sessions. Whenever the therapist tried to discuss mother, N.R. would shut down. Mother and N.R. had two conjoint therapy sessions, and mother appeared irritable and did not respect N.R.'s boundaries.

N.R.'s CASA opined it would not be in N.R.'s best interests, and that N.R. would "suffer" if returned to mother. The CASA recommended termination of mother's reunification services, and that N.R. remain placed with maternal great-aunt, where she was thriving.

In a last minute information for the court, the social worker noted that mother continued to be rude and inappropriate with social workers, the caregiver, and Regional Center staff "on numerous occasions." N.R. still did not want to return to mother's care, and threatened to run away if she were returned to mother.

A February 23, 2021 letter from the Regional Center noted that mother was receiving 1,084 hours of services each month and has demonstrated that she is motivated to regain custody of her children.

The section 366.25 permanency review hearing was held on March 26, 2021.  N.R. told the court she wanted to stay placed with maternal great-aunt, even if her little sister were returned to mother's care.

The court terminated reunification services, and set a section 366.26 permanency planning hearing, finding it would be detrimental to N.R. to be returned to mother's care.  The court acknowledged that it was "very torn" because of mother's "tremendous growth" but that the court was concerned about mother's continued contact with R.L.'s father and the trauma to N.R. of being returned to mother's care.

Mother filed a timely notice of intent to file a writ petition, and the present petition for extraordinary relief followed.

## DISCUSSION

When a child over the age of three years is removed from a parent, the child and parent are typically entitled to 12 months of reunification, which may be extended to 18 months.  (§ 361.5, subd. (a)(1)(A) & (3)(A).)  Pursuant to section 366.22, within 18 months after a dependent child is removed from the physical custody of his or her parent, a permanency review hearing must occur to review the child's status.  (§ 366.22, subd. (a)(1); see also § 366.25, subd. (a)(1) [addressing subsequent permanency review hearings, as was held here, which must occur within 24 months of removal].)

At the hearing, the juvenile court "shall order the return of the child to the physical custody of his or her parent or legal

guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§§ 366.22, subd. (a)(1), 366.25, subd. (a)(1).)

We review the juvenile court's detriment finding for substantial evidence. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341.) We construe the evidence and resolve all evidentiary conflicts in the light most favorable to the juvenile court's determination. (*In re R.T.* (2017) 3 Cal.5th 622, 633; *In re David H.* (2008) 165 Cal.App.4th 1626, 1633.)

A parent's compliance with the case plan is not the only factor the juvenile court must consider in deciding whether to return a child to the parent's care. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139–1140.) Where the parent has complied with their case plan, the question is not whether the parent has participated in services, but whether the parent has benefited from those services. (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) Moreover, the court may not simply defer to a child's placement preference when making its detriment finding. (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 507; see also *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1265.)

Mother contends "there was not substantial evidence [N.R.] would not be safe in [mother's] care nor that she would suffer emotional detriment if she returned to her care." We find substantial evidence, described in detail above, and which does not require repetition, supports the juvenile court's detriment finding. This is not a case where the court simply deferred to

15

N.R.'s placement preference. There was extensive, substantial evidence of the detriment to N.R. if she were to be returned to mother's care. (Cf. *Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 868 [finding no substantial evidence supported the finding of detriment to child if he were returned to mother's custody].)

## DISPOSITION

The petition is denied. This opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A) of the California Rules of Court. The September 15, 2021 order staying the section 366.26 hearing is hereby lifted.


GRIMES, Acting P. J.


WE CONCUR:


STRATTON, J.


WILEY, J.


16